IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| JOHN DOWNIE, § | |
|     Plaintiff, § | |
| § | CIVIL ACTION NO. |
| v. § | 3:05-CV-1640-P |
| § | (ECF) |
| COMMISSIONER, SOCIAL § | |
| SECURITY ADMINISTRATION, § | |
|     Defendant. § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

This is an appeal from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying the claim of John Downie ("Plaintiff") for disability insurance benefits ("DIB") under Title II of the Social Security Act. The Court considered Plaintiff's Brief on Appeal and Defendant's Brief and reviewed the record in connection with the pleadings. For the reasons that follow, the final decision of the Commissioner should be affirmed in part, reversed in part, and remanded for further consideration at step five.

I.

The factual and procedural background is taken from the administrative record. On May 19, 2003, Plaintiff filed an application for DIB, alleging an August 1, 1995, onset date of disability. The claim was denied initially and on reconsideration, and Plaintiff timely requested a hearing before an administrative law judge ("ALJ"). The hearing proceeded before ALJ James Lessis in Dallas, Texas on April 14, 2004. The witnesses were Karyl Kuuttila, an impartial vocational expert ("VE"), Hellmut Tauber, M.D., an impartial medical expert ("ME"), Plaintiff, and his wife, Bertha Downie ("Ms. Downie"). An attorney represented Plaintiff in the disability proceedings and continues to represent him on appeal.

Plaintiff was born in January, 1943. On his alleged onset date, August 1, 1995, he was a

person closely approaching advanced age. *See* 20 C.F.R. § 404.1563(d). His date last insured ("DLI") was December 31, 1997. Plantiff had more than a high school education. His past relevant work ("PRW") was as a telephone service technician, pulling cable and installing telephone-type wiring.

## II.

Plaintiff had a long history of medical problems, including a lacunar infarct secondary to hypertension in 1988. (Tr. 645-57.)[1] On October 31, 1995, Plaintiff went to Suresh Kumar Raheja, M.D. ("Dr. Raheja") at Southwest Physicians with chest pain. (Tr. 955.) Approximately two weeks later, he went to Methodist Hospitals of Dallas, complaining of discomfort in both arms that radiated into his chest. (Tr. 907.) The diagnosis was a relatively new onset of anginal symptoms with three vessel disease and a mildly depressed left ventricular function. (*Id*.) Paul Kempe, M.D. ("Dr. Kempe"), performed a coronary artery bypass grafting operation to five coronary arteries utilizing the left internal mammary to the left anterior descending artery and separate saphenous vein grafts to the diagonal artery, the ramus intermedius artery, the circumflex marginal artery and the posterior descending artery. (Tr. 922.) Plaintiff tolerated the procedure well, and chest x-rays showed that the appearance of his chest had improved. Plaintiff was discharged from the hospital on November 7, 1995, in good spirits, with no complaints, and appeared not to be in distress. His principal diagnosis was stenotic arteriosclerotic coronary artery disease. (Tr. 919, 922.)

On November 29, 1995, Plaintiff went to Rita Phillips, M.D. ("Dr. Phillips") for follow up and cardiac rehabilitation. (Tr. 955.) His left leg had healed, and he was doing well. He had no complaints, and his lungs were clear. He missed his appointment that had been scheduled for

---

[1] The abbreviation "Tr." refers to the administrative record.

December 8, 1995. In 1996, Dr. Phillips diagnosed him with coronary artery disease ("CAD"), stable congestive heart failure ("CHF"), and increased cholesterol. (Tr. 955.) On July 15, 1997, Plaintiff reported that he had experienced two episodes of angina. (Tr. 696.) His blood pressure was 160/100. (*Id.*) Dr. Phillips diagnosed hypertension ("HTN") still elevated, CAD with status post coronary artery bypass graft ("CABG"). She stated that he should not be having angina and that she would monitor his symptoms and refer him to a cardiologist if necessary. (*Id.*) Plaintiff returned to Dr. Phillips on September 16, 1997, and reported that he had no complaints and was compliant with his medications. Dr. Phillips found that his blood pressure was still elevated at 150/100. (Tr. 956.) Dr. Phillips diagnosed HTN-inadequate control, CAD-status post CABG and hypercholesterolemia. (*Id.*) On February 13, 1999, Plaintiff was feeling fine, had no chest pain, and did not experience shortness of breath. His chest was clear, and he had no extremity edema. (Tr. 950.) Dr. Phillips monitored his CAD, CHF, and hypercholesterolemia through 1999 and 2000. (Tr. 958-59.) Both Plaintiff's physical and mental conditions deteriorated significantly after that time. (*See* Pl.'s Br. at 4-11 for a summary of Plaintiff's physical and mental condition after his DLI.)

Plaintiff testified that he was self employed from 1991-1995, pulling cable for communications and putting in telephone jacks and telephone-type wiring. (Tr. 29-30.) He said that previously he had been employed by Southwestern Bell for 33 years as a lead service technician, ordering and delivering equipment and putting in telephone cable and systems. (Tr. 34.) His self employment work was basically the same, except that it included solicitation of work. (*Id.*) He testified that he spent 1 hour standing, 30 minutes to 1 hour walking, and about 2½ to 3 hours sitting. (Tr. 35-36.)

Plaintiff's wife testified that when Plaintiff was stationed in Panama in the service, he had

severe nightmares and jumped at loud noises, such as horns. (Tr. 42.) When he left the service, he was still having some nightmares. (Tr. 43.) The nightmares started getting worse again in November 2000. (Tr. 44.) She stated that after his surgery, he got a little better, but then became worse again. (*Id*.) When he was working for himself, he had good days and bad days. (Tr. 45.)

The VE identified Plaintiff's PRW as a utilities and maintenance supervisor. Dept. of Labor, <u>Dictionary of Occupational Titles</u> (( "DOT")[2] # 899.131-018). This was light work with an SVP of VIII, skilled. The VE also identified Plaintiff's PRW as cable installer/repairer (DOT # 821.361-010) which was medium work with an SVP of VIII, also skilled work. The VE testified that a hypothetical individual of Plaintiff's age and education with a sedentary residual functional capacity ("RFC") could not perform Plaintiff's PRW.

The VE testified that Plaintiff had transferable skills to sedentary work, starting in 1995 when he was 52 years old. The VE testified that Plaintiff had skills in electrical and electronic fabrication, installation, and repair and some mechanical type of installation and repair. (Tr. 46-47.) The VE stated that there are approximately 15 occupations with similar material products and subject matters that Plaintiff could perform. (*Id*.) One would be trouble locator, test desk (sedentary work with an SVP of VI, skilled) which would involve helping customers on the telephone and perhaps running a test check. (*Id*.) There are approximately 649,130 of these jobs nationally and 115,550 locally. (Tr. 48.) Others jobs would include an order dispatcher, utilities (sedentary with an SVP of VI, skilled) with 1,338,517 nationally and 12,850 locally. (*Id*.) As a third example, the VE mentioned electronics assembly, an occupation that would involve inspection, repair, testing, and assembly of electronic components and equipment. It is sedentary work with an SVP of III and

---

[2] References are to Dept. Of Labor, DOT (4th Ed. Rev. 1991).

is considered semi-skilled.  In the national economy there are 318,700 of these jobs and in Texas, 22,000.  (Tr. 49.)

The ALJ asked for other examples of SVP III or IV, and the VE gave other examples at the semi-skilled level.  He said programming equipment operation, electronic components, was sedentary work with an SVP of III and said there are 398,180 jobs nationally and 18,550 jobs locally.  He also mentioned tester of electronic components, sedentary work with an SVP of III which would be semi-skilled.  There are approximately two million of these jobs in the national economy and 24,200 jobs in Texas.  (*Id.*)  The VE continued to give examples of other work Plaintiff could perform, giving a total of fifteen jobs.  (Tr. 49-50.)  Plaintiff's attorney did not have any questions for the VE.  (Tr. 50.)

The ALJ gave the VE a second hypothetical which was the same as the first except the hypothetical claimant was mentally limited to simple routine repetitive unskilled work.  The VE testified that the additional limitation would preclude transferability of skills.  (Tr. 23.)  The ALJ stated that he really didn't think anyone could determine Plaintiff's mental state during the covered period, but he gave the attorney the opportunity to supplement the evidence on this issue.

In a decision on July 29, 1994, the ALJ found that Plaintiff was unable to return to his PRW as a utility maintenance person or cable installer.  (Tr. 23, ¶ 1.)  The ALJ considered whether Plaintiff's impairments prevented him from doing any work, considering his RFC for a reduced range of sedentary work,[3] his age, education, and past work experience.  The ALJ found that

---

[3] Sedentary work involves sitting for about six hours out of an eight hour work day and occasionally lifting items weighing no more than 10 pounds. *Lawler v. Heckler*, 761 F.2d 195, 197-8 (5th Cir. 1985). *See also* 20 C.F.R. § 404.1567(a) (2005). Sedentary work requires occasionally lifting or carrying articles like docket files, ledgers, and small tools.

Plaintiff could still perform other work, including work as a trouble locator, dispatcher, electronic assembly person, equipment programer, and tester. (Tr. 25, finding no. 12.) Therefore, the ALJ found that Plaintiff was not disabled and denied Plaintiff DIB. Plaintiff requested Appeals Council review on September 16, 2004. (Tr. 13.) The Appeals Council denied the request for review on June 17, 2005, making the ALJ's June 29, 2004, decision the Commissioner's final decision. (Tr. 7-12). Plaintiff now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Plaintiff claims that the ALJ's finding that Plaintiff was not disabled from his alleged onset date of August 1, 1995, through December 31, 1997, his DLI for Title II benefits, is not supported by substantial evidence and results from prejudicial legal error.

### III.

To be entitled to social security benefits, a plaintiff must prove that he is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

> 3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.
>
> 4. If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.
>
> 5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove his disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

An individual must demonstrate onset of disability on or before his DLI in order to qualify for DIB. Thus, a claimant who becomes disabled after the expiration of his insured status is not entitled to benefits under Title II of the Social Security Act. *Oldham v. Schweiker*, 660 F.2d 1078, 1080 (5th Cir. 1981); 42 U.S.C. §§ 416(i)(3), 423c. Claimants bear the burden of establishing a disabling condition before the expiration of insured status. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564.

Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

## IV.

The parties agree that Plaintiff cannot perform his past relevant work and that the controlling issue at step five is whether the Commissioner met his burden to show that Plaintiff is capable of doing other work. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). Plaintiff contends that the ALJ's finding that Plaintiff was not disabled based upon testimony from the VE that Plaintiff had transferable skills from his past relevant work was erroneous and not based upon substantial evidence. Specifically, Plaintiff contends that the VE misidentified Plaintiff's past work as a "utilites and maintenance supervisor" and as a "cable installer/repairer." Plaintiff contends that the job descriptions for these jobs in the DOT were not the job descriptions for someone working for a telephone company but rather, were jobs for someone in the electronics industry. Accordingly, Plaintiff contends that the VE's testimony was unreliable and does not constitute substantial evidence that he had transferable skills.

The Commissioner contends that Plaintiff waived this error because Plaintiff's counsel failed to question the VE. The Fifth Circuit Court of Appeals has cautioned that:

8

> [C]laimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing.

*See Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000). However, the kind of conflict discussed in *Carey* is a conflict between the DOT and the VE's testimony at the hearing before the ALJ. *Id*. The question there would be whether to credit the VE's testimony or the DOT.[4] Plaintiff is not complaining of a *Carey*-type conflict. Rather, Plaintiff claims that the VE unintentionally mischaracterized Plaintiff's PRW which led the ALJ to an erroneous decision regarding (1) whether Plaintiff's work skills could be used in other work and (2) the specific occupations in which they could be used. *See* 20 C.F.R. § 416.966(e). Further, to require the claimant or his counsel to catch a mistake of this nature by the VE would shift the burden to produce and develop vocational evidence back to the claimant. *See Gravel v. Barnhart*, 360 F. Supp. 442, 452 n.23 (N.D. N.Y. 2005). Accordingly, the Court finds that Plaintiff did not waive the error regarding the VE's testimony.

The Commissioner's finding that Plaintiff obtained transferable skills from past employment must be supported by substantial evidence. *See Faison v. Sec'y of Health & Human Servs.*, 679 F.2d 598, 600 (6th Cir. 1982). Whether skills are transferable depends largely on the similarity of occupationally significant work activities among the different jobs. 20 C.F.R. § 404.1568(d)(1).

---

[4] Social Security Rulings ("SSR") are binding on all components of the Social Security Administration. The Social Security Administration has issued a ruling that squarely addresses how a *Carey*-type situation should be handled. *See* 20 C.F.R. § 402.35(b)(1)(stating that SSR 00-4p requires that the ALJ ask the VE whether any possible conflict exists between the VE's testimony and the DOT, and that, if the testimony does appear to conflict with the DOT, to "elicit a reasonable explanation for the apparent conflict." The Ruling requires the explanation to be on the record and requires the ALJ to explain in his decision how the conflict was resolved.

The factors that are important to transferability are that: (1) the same or lesser degree of skill be required; (2) the same or similar tools and machines be used; and (3) the same or similar raw materials, products, processes or services be involved. 20 C.F.R. § 404.1568(d)(2). Although a complete similarity of all three factors is not required, skills are not transferable when they are so specialized or have been acquired in such an isolated vocations setting that they are not readily usable in other work settings. 20 C.F.R. § 404.1568(d)(3). A skill is a "learned power of doing something competently; a developed or acquired aptitude or ability." *Blake v. Sec'y of Health & Human Servs.*, 528 F. Supp. 881, 885 (E.D. Mich. 1981) (quoting Webster's Third New International Dictionary (1964)). Transferable skills "refer to learned abilities which combine knowledge with coordinated physical movements, such as operating a typewriter, or a learned mental discipline, or an area of expertise." *Ellington v. Sec'y of Health & Human Servs.*, 738 F.2d 159, 161 (6th Cir. 1984).

Plaintiff contends the two jobs that the VE identified as Plaintiff's PRW were not his past work, but rather, were jobs for someone in the electronics industry, rather than the telecommunications industry where Plaintiff worked. (Pl.'s Br. at 13.) The Commissioner does not dispute this fact, but states that the mistake is irrelevant because Plaintiff's work was skilled. (Def.'s Br. at 18.)

Plaintiff testified that he was self employed from 1991-1995, pulling cable for communications and putting in telephone jacks and telephone-type wiring. (Tr. 29-30.) He said that previously he had been employed by Southwestern Bell for 33 years as a lead service technician, ordering and delivering telephone equipment and putting in telephone cable and system. (Tr. 34.) His self employment work was basically the same, except that it included solicitation of work. (*Id.*)

10

The VE first identified Plaintiff's PRW as a "utilities and maintenance supervisor" under code number 899.131-018. A "utilities and maintenance supervisor:" "[s]upervises and coordinates activities of workers engaged in maintaining building utility systems, such as electrical wiring and control systems, heating, ventilating, water supply, steam generating, and related pipe systems . . . ." *See* DOT 913. The second job the VE identified as Plaintiff's PRW was that of "cable installer/repairer," under code number 821.361-010. *See* DOT 870. The description of the job in pertinent part is: "[i]nstalls and repairs underground conduit and cable systems used to conduct electrical energy between substations and consumers: [i]nstalls and repairs conduits following blueprints." *See id.* Plaintiff contends that the proper descriptions of his job are (1) "Line Supervisor (tel & tel)" and (2) "Line-Installer-Repairer." *See* DOT 872, 874. The description for "Line Supervisor" provides: "[s]upervises and coordinates activities of telephone or telegraph workers engaged in construction, removal, and rearrangement of open-wire and carrier cable communication equipment: [e]xamines work order and wiring diagrams to determine installation or repair procedures: [i]nspects connections, fitting, and installed wire and cable sections for conformance to specifications." DOT 872. The "Line Installer-Repairer" description provides: "[i]nstalls and repairs telephone and telegraph lines, poles, and related equipment, according to diagrams . . . ." DOT 874.

The VE identified Plaintiff as having skills in electrical and electronic fabrication, installation, and repair, and some mechanical type of installation and repair. (Tr. 47.) The VE identified Plaintiff's primary skill as "electrical knowledge." The ALJ asked, "Would these skills transfer to jobs in similar industries and work settings or would they be different?" (*Id.*) The VE answered, "No. They would be would be within the similar, similar range. They're the similar

11

material products and subject matter." (*Id.*)

Transferability of skills "depends largely on the similarity of occupationally significant work activities among different jobs." 20 C.F.R. § 404.1568(d). The Commissioner had an affirmative burden to link up Plaintiff's skills that are based on his own personal experience with the proposed jobs. *Jeffcoat v. Sec'y of Health & Human Servs.*, 910 F. Supp. 1187, 1195 (E.D. Tex. 1995) (citing 20 C.F.R. § 404.1565; *Epps v. Harris,* 624 F.2d 1267, 1274 (5th Cir. 1980); *Wilson v. Califano,* 617 F.2d 1050, 1053 (4th Cir. 1980); *Taylor v. Weinberger,* 512 F.2d 664, 668 (4th Cir. 1975); *Watson v. Sec'y of Health, Educ. & Welfare of U.S.*, 478 F. Supp. 394, 397-98 (N.D. Tex. 1979)). The "facts pertaining to the capacity of a specific individual can be supplied only by particularized proof." *Id.* at 398 (quoting *Taylor*, 512 F.2d at 668).

The Commissioner admits that Plaintiff worked in the telecommunications industry and that the VE classified Plaintiff's PRW as being in the electronics industry. The VE testified that Plaintiff's primary skill became "electrical knowledge." The ALJ relied upon flawed and confusing testimony from the VE. The VE's mischaracterization of Plaintiff's PRW formed the basis for the remainder of the VE's testimony and thus the VE's assessment of Plaintiff's transferable skills from hypothetical jobs in the electronics industry (which were not Plaintiff's PRW) does not constitute substantial evidence to support the ALJ's decision that Plaintiff could perform the jobs identified by the VE. The record does not show that the skills Plaintiff acquired working in the telecommunications industry would be the same skills he would have acquired in the electronics industry if his PRW had been correctly identified by the VE. Therefore, substantial evidence does not support the ALJ's conclusion that Plaintiff had transferability of skills to the jobs the VE identified while erroneously testifying that Plaintiff had been working in electronics. The Court

finds that reversal and remand is required to determine if the Commissioner can meet his burden at step five to show whether Plaintiff can perform other work that exists in significant numbers in the national and local economies.

Plaintiff additionally contends that the VE erred by failing to specify what age group she assigned to Plaintiff. In response to the ALJ's question of whether there were transferable skills, the VE stated "I wanted to clarify his age." (Tr. 46.) The VE asked if the ALJ wanted her to consider Plaintiff's present age or his age at the time? The ALJ responded, "You can consider it all. The age during the entire time." (*Id.*) Plaintiff claims that this should have elicited three separate responses from the VE because Plaintiff was: (1) closely approaching advanced age at his onset date, (2) 8 days from advanced age on his DLI, and (3) closely approaching retirement age at the time of the hearing. The VE did not clarify which age category she was using when she testified that Plaintiff had transferable skills. Since reversal and remand is required based upon the VE's mischaracterization of Plaintiff's PRW, the ALJ can clarify the question of age categories on remand.

## V.

Plaintiff alleges that the ALJ failed to fully evaluate whether he met or equaled a Listing,[5]

---

[5] The Listings define presumptive impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). To be disabled pursuant to the Appendix 1 listings, a claimant must prove that he meets or equals all of the specified medical criteria of the particular listing. *Id.* at 530 (impairment does not meet or equal listing if it has only some of the medical criteria, no matter how severe). Moreover, a claimant whose impairment fails to meet the stated criteria by even a slight margin fails to qualify. *Id.* at 530 n.8.

specifically Listing 4.12B.[6] (Pl.'s Br. at 18.) Plaintiff points to the March 20, 2002, report of state agency medical consultant ("SAMC")[7] M. Dolan, M.D. ("Dr. Dolan") in which Dr. Dolan stated that Plaintiff equaled Listing 4.12B. (Tr. 977). However, the determination at the reconsideration level by Frederick Cremona, M.D., that Plaintiff is not disabled includes a medical determination that Plaintiff does not meet or equal any listed impairment (*i.e.*, physician's signature on the SSA-831-C3 or U5 form) (Tr. 53). 20 C.F.R. § 404.1527(f)(1); SSR 96-6p, 1996 WL 374180 (July 2, 1996). The ALJ had the discretion to determine the credibility of the various medical reports in the record. *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991). Substantial evidence supports his conclusions. The ALJ noted Plaintiff's post-DLI medical history. (Tr. 22.) In January 2000, Plaintiff developed difficulties with TIA, cerebral atrophy, and was diagnosed with heart disease and gout. (*Id*.) In October 2000, he had vascular surgery and degenerative disc disease. (*Id*.) In May 2001, he had congestive heart problems and high blood pressure, and in 2003, diagnoses included renal failure, and post traumatic stress disorder. Dr. Dolan's assessment of the record dated March 20, 2002, mentioned the angioplasty of the legs in October, 2000 and described Plaintiff's

---

[6] Under Listing 4.12, *Peripheral Arterial Disease*, evidence of peripheral arterial disease should show that the individual has intermittent claudication with marked impairment of peripheral arterial circulation as determined by Doppler studies showing a resting ankle/brachial systolic blood pressure ratio of less than 0.50. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, Listing 4.12B1. In the alternative, a claimant may satisfy this listing with a greater than 50 percent drop in his systolic blood pressure at the ankle with exercise, with 10 minutes or more to return to the pre-exercise level. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, Listing 4.12B2. None of Plaintiff's medical records before December 31, 1997 show that he met these criteria.

[7] A SAMC can make an equivalency determination on the record alone, without a personal examination. *Ransom v. Heckler*, 715 F.2d 989, 993-94 (5th Cir. 1983) (detailed descriptions of the results of claimant's examination allowed the non-examining DDS physician to determine that claimant's limitation of spinal motion and motor loss were not significant under § 1.05C of the Listing of Impairments).

ambulatory ability. (*Id*.) Contrary to Plaintiff's assertion that the ALJ never considered Dr. Dolan's review of the record, the ALJ specifically found as follows:

> the record does not contain any opinion from treating or examining physician indicating that the claimant was disabled or even had greater limitations greater than those determined in this decision.  The undersigned Administrative Law Judge is cognizant that appropriate consideration must be given relative to the opinions of the state agency medical consultants [such as Dr. Dolan] under the provisions of 96-6p.  The state medical consultant and the undersigned have determined, albeit under different rationales, that the claimant was not disabled prior to December 31, 1997.  *Insofar as those opinions and conclusions are consistent with the findings and conclusions rendered herein, they are accepted as valid.* [Emphasis supplied.]

(*Id*.)  Thus, the ALJ considered Dr. Dolan's opinion and rejected it to the extent that it was inconsistent with the ALJ's opinion.  Dr. Dolan was the only doctor in this case who found that Plaintiff met or equaled a listing impairment.  At the hearing, the ALJ asked the ME, "What about, listings then and now?" The ME responded, "I believe he did not have a listing level at that time, but he should have been restricted to sedentary work."[8]  (Tr. 31.)  The ALJ in this case restricted Plaintiff to sedentary work.  Accordingly, Plaintiff has not shown that the ALJ failed to fully evaluated whether Plaintiff met or equaled a listing before his DLI.  Substantial evidence supports the ALJ's determination and the ALJ did not commit a prejudicial legal error.

## VI.

Plaintiff alleges that the ALJ erred by failing to find his mental impairments to be "severe" under the regulations. (Pl.'s Br. at 19.)   He also alleges that the ALJ failed to "consider the mental impairment from the organic mental impairment of cerebral atrophy." (*Id*. at 21.)  First, the Court notes that Plaintiff did not allege cerebral atrophy as an impairment in his disability reports. (Tr.

---

[8] The ME related that Plaintiff was diagnosed with coronary artery disease in 1995. The ME indicated that, after undergoing a coronary artery bi-pass operation in late 1995, Downie "did fairly well" until January 2000.  (Tr. 30.)

118-43.) A severe impairment is an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "An impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985). *Stone* imposes two requirements on ALJs and the Appeals Council before they can find a claimant not disabled *at step two* of the sequential five-step disability inquiry. Initially, the Court notes that Plaintiff's arguments regarding severity are inapplicable because the ALJ's disability determination did not conclude at step two. *See Chapparo v. Bowen*, 815 F.2d 1008, 1011 (5th Cir. 1987) (holding that argument regarding improper application of the *Stone* standard is irrelevant to disposition of case if outcome of case does not turn on issue of severity); *see also Shipley v. Director of Health & Human Servs.*, 812 F.2d 934, 935 (5th Cir. 1987).

In this case, the ALJ directly referenced *Stone*. (Tr. 20.) In addition to the teachings of *Stone*, the ALJ recognized that he must apply SSR 85-28 which provides that an impairment is not severe if it has no more than a minimal effect on an individual's ability to do basic work functions. The ALJ met both requirements for determining that Plaintiff did not have a severe mental impairment. After setting out the standards, the ALJ noted that "[r]ecords received subsequent to the hearing and dated May 9, 2002, noted that the claimant reported 'after discharge from the military . . . he was able to work, raise a family, and volunteer in the community.'" (Tr. 1435.) He noted that the onset of current mental symptoms appeared after he was attacked in his office by a former employee in November of 2000. The ALJ held that "consistent with the testimony of the medical expert and the evidence of record, the claimant had no significant mental limitations prior

16

to December 31, 1997 [the DLI]."  (Tr. 20.)

Plaintiff states that the ALJ's statement about the ME's testimony is inaccurate.  Plaintiff concludes from the ME's testimony that Plaintiff had cognitive problems resulting from a mental impairment (cerebral atrophy) before his DLI. (Pl.'s Br. at 20-21.)  Plaintiff derives this conclusion from the ME's statements that (1) "Plaintiff had a variety of illnesses at the time of the hearing but he believed it all started from the arteriosclerotic heart disease which required a bypass operation in October of 1995;" (2)  "Plaintiff had cerebral atrophy which would impair his memory and his ability to express himself;" and (3) "it could very well be that Plaintiff had some problems from the bypass in 1995." (*Id*. At 20.)  The Court finds that the ME was speaking in generalities such as "often people develop slight brain damages after a bypass surgery," (Tr. 38) and  it was "not unusual for people to have a stroke or stroke like symptoms during a bypass surgery because the machine used [in 1995] allowed gas bubbles to enter the brain."  (Tr. 39).  The ME did not testify that Plaintiff had cerebral atrophy before December 31, 1997.  In fact, the ALJ specifically asked the ME if he saw anything in the file about Plaintiff's mental functioning back then (before the DLI).  (*Id*.)  The ME stated unequivocally, "No." (*Id*.)  The ALJ asked Plaintiff's counsel if he saw anything.  Counsel replied, "Well, not during our time period under consideration.  The first time it's mentioned is in, he went and saw a doctor in 2001, in September of 2001." (Tr. 40.)  No treating physician, consultative physician, SAMC, or ME stated that Plaintiff had cerebral atrophy before his DLI.  Plaintiff's arguments lack merit.

Similarly, the ALJ did not violate relevant legal standards or commit error by refusing to find Plaintiff's Post-Traumatic Stress Disorder ("PTSD") severe under the regulations.  The ALJ properly cited and applied the rule on impairment severity established by the Fifth Circuit.  Plaintiff's alleged

PTSD, depression, and anxiety do not satisfy the *Stone* standard for severity. The record indicates that evidence of Plaintiff's mental impairment applies to the period after his DLI expired, i.e., after December 31, 1997. The ALJ has no discretion to find disability based on evidence relating to the period after the expiration of a claimant's DLI. Thus, the ALJ's severity finding is supported by substantial evidence and is not the result of prejudicial legal error.

### VII.

Plaintiff's alleged errors that: (1) the ALJ failed to fully evaluate whether he met or equaled a Listing and (2) the ALJ erred by failing to find his mental impairments to be "severe" under the regulations are without merit. However, Plaintiff has shown that the ALJ did not meet his burden at step five to show that work existed in significant numbers in the national and local economies that Plaintiff could perform. The ALJ's conclusions were based upon the VE's misidentification of Plaintiff's PRW. Because of the VE's flawed hypothesis that Plaintiff's job was in the electronics industry, the VE's conclusion that Plaintiff acquired electronic skills is also flawed. Thus the VE's testimony does not constitute substantial evidence that other work existed that Plaintiff could perform. The ALJ's decision at step five is not supported by substantial evidence and results from prejudicial legal error.

This Court recommends that the District Court affirm the Commissioner's decision in part, reverse the decision in part, and remand the decision for further consideration at step five.

Signed March 22, 2007.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## **INSTRUCTIONS FOR SERVICE AND**
## **NOTICE OF RIGHT TO APPEAL/OBJECT**

The United States District Clerk shall serve a true copy of these findings, conclusions and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must serve and file written objections within ten days after being served with a copy.  A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory or general objections.  A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466, 472 (1985).  Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).